UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRISTINE DAVID and RODNEY CLURE,<br><br>Plaintiffs,<br><br>v.<br><br>BANKERS LIFE AND CASUALTY CO.,<br><br>Defendant. | Case No. C14-766RSL<br><br>ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on "Plaintiffs' Motion for Summary Judgment on Liability," Dkt. # 95, and "Defendant's Motion for Partial Summary Judgment," Dkt. # 97. The Court has reviewed the parties' memoranda, the associated declarations and exhibits, and the remainder of the record. For the following reasons, plaintiffs' motion, Dkt. # 95, is GRANTED in part, and DENIED in part; and defendant's motion, Dkt. # 97, is GRANTED.

## I. BACKGROUND

Defendant Bankers Life and Casualty Company ("Bankers Life" or "Bankers") is an insurance company that hires agents to sell its products. Bankers hires its agents as independent contractors and compensates them through commissions on the insurance products they sell. Christine David and Rodney Clure are former Bankers Life agents who claim that, in reality, they were employees instead of independent contractors and that they are entitled to overtime pay under Washington's Minimum Wage Act ("MWA"), RCW 49.46.010 *et seq*. Dkt. # 95. Bankers Life contends that plaintiffs were not employees under the MWA and that, even if they

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 1

were, they were exempt from the MWA's overtime requirements as either outside salespersons or retail-sales employees. Dkt. # 101.

Clure and David joined Bankers Life's Bellevue, Washington office as insurance agents in June 2008 and August 2009, respectively. When they joined, they each signed an Agent Contract that set out terms of employment. See, e.g., Dkt. # 7-4 at 8–29 (David's Agent Contract). Among other things, the Agent Contract specified that the agent was an independent contractor and disclaimed any employer-employee relationship. Id. at 8. It also provided that the agent would be compensated solely through commissions derived from sales, id. at 9; that the contract was terminable at will and for convenience by either party, id. at 12; and that the agent was subject to a two-year noncompetition and nonsolicitation restriction for the territory that the agent's office covered, id. at 13. In addition, agents were "captive," meaning they could not sell insurance products from other companies. See Dkt. # 10-3 at 89.

Although the contract explicitly provided that plaintiffs were independent contractors, plaintiffs present evidence suggesting they were actually employees. Christine David states that "Bankers managers controlled virtually every aspect of how [agents] did [their] jobs." David Decl. (Dkt. # 9-2) ¶ 3. For example, she states that managers required agents to spend certain days in the field and other days in the office (so-called "field days" and "office days"), id.; that on certain days agents had to prove they made a minimum number of calls and booked a certain number of appointments before leaving, id.; that Bankers required agents to buy sales leads, id. ¶ 10; that Bankers controlled agents' hours and required attendance at meetings and trainings, id. ¶ 6; that agents needed permission to take time off, id. ¶ 7; that she was strongly discouraged from holding another job, id. ¶ 7; and that agents were at times pressured to work weekends, id. ¶ 3. She also states that Bankers controlled the script of her sales pitches, her marketing materials and business cards, and the way agents dressed in the office, id. ¶¶ 4, 9–10.

Rodney Clure echoes David's claims that Bankers controlled many aspects of agents' work. Clure Decl. (Dkt. # 8-15) ¶¶ 4–11. He states that he was required to attend mandatory training classes, id. ¶ 4; that Bankers limited his lunch time and prohibited him from taking

breaks, id. ¶ 6; that he was disciplined for being late, id. ¶ 10; and that Bankers managers dictated the days he was allowed to spend in the office and in the field, id. ¶ 8.

Plaintiffs also cite deposition testimony from Marlon Canda, who was a Unit Sales Manager in the Bellevue office during plaintiffs' time there. Canda Dep. (Dkt. # 96-5) at 17. As a Unit Sales Manager, Canda directly supervised agents and reported to the office's Branch Sales Manager. See id. at 39–42. Canda's testimony indicates that agents were disciplined for deviating from dictated schedules, workplace rules, and other requirements, id. at 46–48, 51–52; that new agents did not enjoy much flexibility in setting their schedules or determining their sales approaches, id. at 145, 203–05; that managers enforced a weekly fifteen-appointment minimum, id. at 103, 107–08; and that he enforced an office dress code, id. at 125–26.

The parties appear to agree that the company controlled certain aspects like marketing materials and business cards, but Bankers Life puts forth evidence that paints a different picture of managers' control over hours and work performance. Bankers cites a declaration by Al Hawks, the Bellevue office's Branch Sales Manager at the time. Hawks Decl. (Dkt. # 11-1) ¶ 3. He explains that the arrangement of designating "office days" and "field days" was simply to allow for training and compliance meetings to occur according to set schedules, because the number of agents in the Bellevue office made it impossible for Bankers to hold those events on an *ad hoc* basis. Id. ¶ 15. He further states that new agents were encouraged but not required to attend training meetings, id. ¶ 16; that agents were never disciplined for choosing not to participate, id.; that agents were given complete discretion over their time and meetings in the field, id. ¶ 17; that agents were not required to make phone calls from the office, id. ¶ 20; and that agents were not prohibited from holding other jobs, id. ¶ 18.

Bankers cites similar assertions in a declaration by Mark Schlichting, who, like Canda, worked under Hawks as a Unit Sales Manager. Schlichting Decl. (Dkt. # 103) ¶ 2. Schlichting states that the requirements plaintiffs point to were actually recommended best practices that agents were not obligated to follow. Id. ¶¶ 3–4. He states that Bankers did not discipline plaintiffs (or any other agents) for failing to adhere to office hours, id. ¶ 3; that Bankers did not

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 3

discipline plaintiffs for failing to meet appointment or call minimums, attend meetings and trainings, or use a particular sales model, id. ¶ 4; and that no agent's contract was ever terminated for attendance issues, id. ¶ 5.

Both plaintiffs were eventually terminated from their jobs with Bankers Life—David in June 2010 and Clure in July 2011. Plaintiffs filed this lawsuit in King County Superior Court as a class action alleging that Bankers Life misclassified its agents as independent contractors and owed overtime under the MWA. After removing the case,[1] Bankers Life successfully moved to decertify plaintiffs' statewide class of agents, Dkt. # 40, leaving David and Clure as the only remaining plaintiffs. Following an appeal and additional discovery, plaintiffs filed a motion for summary judgment on the issue of liability under the MWA. Dkt. # 95. Bankers Life filed a motion for partial summary judgment regarding the method for calculating plaintiffs' potential overtime damages. Dkt. # 97.

## II. DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and "citing to particular parts of materials in the record" that show the absence of a genuine issue of material fact, Fed. R. Civ. P. 56(c). Once the moving party has satisfied its burden, it is entitled to summary judgment if the nonmoving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving

---

[1] After plaintiffs brought their initial class action, Bankers Life removed the case under the Class Action Fairness Act ("CAFA"), 18 U.S.C. § 1332(d), and the Court remanded to King County Superior Court, see David v. Bankers Life & Cas. Co., C11-1211RSL (W.D. Wash. Jul. 20, 2011). On remand, the court certified a statewide class of more than 1,000 agents, see Dkt. # 12-10; Dkt. # 12-16, and Bankers removed the case to this Court a second time, Dkt. # 1.

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 4

party . . . and draw all reasonable inferences in that party's favor." Krechman v. Cty. of Riverside, 723 F.3d 1104, 1109 (9th Cir. 2013).

**A.    Plaintiff's Motion Regarding Liability**

Plaintiffs seek summary judgment on the issue of liability under the MWA. Dkt. # 95. Specifically, plaintiffs seek an order concluding that plaintiffs were employees instead of independent contractors and that Bankers cannot satisfy any of the MWA's exemptions.

**1.    Employee Status**

The MWA broadly defines an employee as any individual permitted to work by an employer.[2] Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 867 (2012). In determining a worker's classification under the MWA, courts ask "whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." Id. at 871. In answering that question, courts consider a nonexclusive list of factors regarding the parties' relationship, which includes:

> (1) The degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; [and] (6) whether the service rendered is an integral part of the alleged employer's business.

Donovan v. Sureway Cleaners, 656 F.2d 1368, 1370 (9th Cir. 1981) (citation omitted); Moba v. Total Transp. Servs. Inc., 16 F. Supp. 3d 1257, 1264 (W.D. Wash. 2014). Neither the presence nor the absence of any individual factor is determinative. Donovan, 656 F.2d at 1370. Control is only significant when it shows that an individual exerts such control over a meaningful part of the business that he stands as a separate economic entity. Id. at 1371.

---

[2]   Under the MWA, the term "employee" includes "any individual employed by an employer," subject to a number of exceptions. See RCW 49.46.010(3). To "employ" includes "to permit to work." RCW 49.46.010(2). An "employer" is "any individual or entity acting directly or indirectly in the interest of an employer in relation to an employee." RCW 49.46.010(4)

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 5

The Court concludes that there is a genuine issue of material fact precluding summary judgment on the issue of plaintiffs' alleged employee status. Central to that conclusion is the parties' dispute over the degree to which Bankers controlled plaintiffs' hours and the manner in which they performed their work. See id. at 1370. Plaintiffs' evidence suggests Bankers controlled their daily hours, weekly schedule, and sales approach in general. In addition, plaintiffs' evidence suggests that they could be disciplined and even terminated for failing to adhere to attendance and sales requirements. In contrast, Bankers Life's evidence suggests that the requirements plaintiffs cite were not mandatory and that agents actually enjoyed flexibility in their decisions of when to come into the office, when to schedule field appointments, how to generate business, and how to approach sales in general.

The circumstances that plaintiffs describe closely resemble an employer-employee relationship, whereas Bankers Life presents a relationship that resembles that of an independent contractor. The competing versions of how much Bankers Life controlled plaintiffs' work creates a genuine issue of material fact as to the economic realities of the parties' relationship and precludes a finding at this stage that plaintiffs were employees.

### 2. Exempt Status

Plaintiffs also seek summary judgment regarding defendant's affirmative defenses, which assert that even if plaintiffs were employees, they were exempt from the MWA's overtime requirements as outside salespersons or retail-sales employees.

As an initial matter, plaintiffs argue that the Court should preclude Bankers Life from asserting any of the MWA's exemptions because Bankers did not classify plaintiffs as employees in the first place. Plaintiffs cite no authority suggesting a defendant cannot argue that alleged employees are independent contractors and alternatively exempt employees. Contrary to plaintiffs' suggestion, the court in Drinkwitz v. Alliant Techsystems, Inc., 140 Wn.2d 291, 301 (2000), did not prohibit the defendant from arguing plaintiffs were exempt employees. Instead, the court reached the merits of the defendant's exemption defenses. See id. at 301–07. In addition, federal courts hearing cases under the Fair Labor Standards Act ("FLSA"), 29 U.S.C.

§ 201 *et seq.*, routinely consider both employee status and asserted exemptions. See, e.g., Brock v. Superior Care, Inc., 840 F.2d 1054, 1058–61 (2d Cir. 1988); Thompson v. Blessed Home Inc., 22 F. Supp. 3d 542, 550 (E.D.N.C. 2014). The Court finds no reason to preclude Bankers Life from asserting the MWA's exemptions.

### a. Outside-Salesperson Exemption

The first of those exemptions is the MWA's "outside salesperson" provision. See RCW 49.46.010(3)(c); WAC 296-128-540. To satisfy the outside-salesperson exemption, an employer must show: (1) the employee was regularly and customarily engaged away from the employer's place of business and the employee regulated her own hours while on the employer's premises; (2) the employee spent 20 percent or less of her work hours on nonexempt tasks; and (3) the employee was paid on the basis of commissions, fees, or guaranteed salary, and was advised of her status as an outside salesperson. WAC 296-128-540; see Huntley v. Frito-Lay, Inc., 96 Wn. App. 398, 403 (1999).

The parties' dueling narratives over how much Bankers Life controlled agents' work creates a genuine issue of material fact regarding the degree to which plaintiffs regulated their hours at the Banker Life office. See WAC 296-128-540(1). In addition, defendants otherwise marshal sufficient evidence to support an inference that plaintiffs' arrangement satisfies the exemption.[3] This precludes summary judgment on the outside-salesperson exemption.

### b. Retail-Sales Exemption

Bankers Life also asserts that plaintiffs are exempt from the MWA's overtime requirements because they are retail-sales employees. See RCW 49.46.130(3). That provision

---

[3] Plaintiffs argue that summary judgment is warranted on the outside-salesperson exemption because Bankers Life cannot show plaintiffs were "advised of" their statuses as outside salespersons. See WAC 296-128-540(3). The record supports plausible inferences that plaintiffs' duties amounted to outside sales work and that the Agent Contract made clear plaintiffs were not entitled to overtime. See Wash. Dep't of Labor & Indus., Admin. Policy ES.A.9.7, at 4 ¶ 9 (Jul. 15, 2014) (explaining the exemption's "advised of" requirement). Without more extensive briefing, the Court cannot say the exemption's "advised of" element entitles plaintiffs to judgment as a matter of law on the issue. See Fed. R. Civ. P. 56(a).

exempts from the MWA's overtime requirements certain employees that work for a "retail or service establishment." See id. When applying the retail-sales exemption, "the first question to ask is whether the entity is a retail or service establishment." Stahl v. Delicor of Puget Sound, Inc., 148 Wn.2d 876, 882 (2003). The MWA defines a "retail or service establishment" as "an establishment seventy-five percent of whose annual dollar volume of sales of goods or services, or both, is not for resale and is recognized as retail sales or services in the particular industry." RCW 49.46.010(6).

The Court concludes that the Bankers Life Bellevue branch was not a "retail or service establishment" within the meaning of the MWA. There is no Washington precedent on whether "retail or service establishment" includes insurance sales offices,[4] but guidance from the Washington Department of Labor and Industries ("L&I") explicitly lists insurance agents as employees that do not fall within the retail sales exemption.[5] Wash. Dep't of Labor & Indus., Admin. Policy ES.A.10.3, at 4 (Jan. 2, 2002). Persuasive federal authority also suggests insurance agents fall outside the FLSA's corresponding exemption.[6] See Mitchell v. Kentucky Fin. Co., 359 U.S. 290, 295 (1959) (explaining that "retail or service establishment" excludes "insurance companies . . . because there is no concept of retail selling or servicing in the[] industr[y]"); 29 C.F.R. § 779.316 (explaining that "transactions of an insurance company are not

---

[4] Bankers Life argues that the Washington Supreme Court's decision in Cooper v. Alsco, Inc., 186 Wn.2d 357, 363 (2016), indicates the exemption applies because that opinion "made clear that commissioned employees in the business of selling long-term contracts are properly subject to the retail sales exemption," Dkt. # 101 at 16. Although the Cooper decision does not exclude contract sales from the exemption's scope, it in no way indicates that all contract sales are included in it.

[5] The Washington Supreme Court has historically looked to agency policy as persuasive when interpreting relevant statutes. See Stevens v. Brink's Home Sec., Inc., 162 Wn.2d 42, 54 (2007).

[6] The Washington legislature patterned the MWA after the FLSA, and courts look to interpretations of analogous FLSA provisions as persuasive authority. See Inniss v. Tandy Corp., 141 Wn.2d 517, 523 (2000). That is particularly appropriate in this case: the federal retail-sales exemption is nearly identical to the MWA's, compare RCW 49.46.130(3), with 29 U.S.C. § 207(i); federal courts apply an identical definition of "retail or service establishment," see Gieg v. DDR, Inc., 407 F.3d 1038, 1047 (9th Cir. 2005); and the authority excluding insurance companies from the federal exemption was the established construction of "retail or sales establishment" at the time of the MWA's enactment.

ordinarily thought of as retail transactions"). Finally, the Bankers Bellevue branch does not appear to have been a retail or service establishment in the natural, commonsense understanding of that term. Though not dispositive, the record suggests the office was a call center and training facility for Bankers personnel that was not open to the public like a storefront or retail location. See id. § 779.319 ("[A]n establishment . . . will not be considered a retail or service establishment . . . if it is not ordinarily available to the general consuming public."). For these reasons, the Court concludes summary judgment for plaintiffs is warranted on Bankers Life's affirmative defense that the MWA's retail-sales exemption bars plaintiffs' claims.

### 3. Other Affirmative Defenses

Plaintiffs also move for summary judgment on Bankers Life's remaining affirmative defenses, Dkt. # 95 at 16, to which Bankers Life chose not to respond. The Court concludes that affirmative defenses one through four, six through ten, and fourteen have either been decided in previous rulings or are otherwise moot. For affirmative defenses eleven, twelve, and thirteen, however, plaintiffs dedicate only one sentence to their argument for summary judgment. Without more argument or evidence, the Court concludes that summary judgment on those defenses is not warranted. See Celotex Corp., 477 U.S. at 323; Fed. R. Civ. P. 56(c).

## B. Defendant's Motion Regarding Damages

Defendant moves for summary judgment on the proper method for calculating plaintiffs' potential overtime damages. Dkt. # 97. If overtime is warranted, the MWA provides that it be paid "at a rate not less than one and one-half times the [employee's] regular rate." RCW 49.46.130. The issue before the Court is how to calculate plaintiff's "regular rate" given that their compensation fluctuated and flowed from commissions rather than hourly pay.

Bankers Life argues that the regular rate should be calculated by dividing total weekly compensation by total hours worked, and that the overtime premium should equal half the regular rate for each hour past forty. Bankers Life's approach assumes that an employee's commissions compensated her at the regular rate for all the work she performed in a week, and

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 9

that the half-time overtime premium makes up the difference between the regular rate she was paid for extra hours and the time-and-a-half overtime rate she should have been paid.

Plaintiffs argue that the regular rate should instead be calculated by dividing total weekly compensation by forty hours (a standard workweek). This approach treats any hour past forty as wholly uncompensated, and it would award plaintiffs damages in the form of an overtime premium one and one-half times the regular rate for each hour in excess of forty. In support of their method, plaintiffs rely on Monahan v. Emerald Performance Materials, LLC, 705 F. Supp. 2d 1206 (W.D. Wash. 2010), and Fiore v. PPG Indus., Inc., 169 Wn. App. 325 (2012), two cases that calculated salaried employees' regular rate by dividing total compensation by forty hours.

Mohahan and Fiore are inapposite because they involved salaried employees, whose compensation structure meaningfully differs from that of commissioned employees. A salaried employee's hourly rate must be reverse engineered from a fixed weekly salary. If the parties fail to establish the number of hours they intended the salary to compensate, then the default assumption is that the salary was intended to cover forty hours of work. Fiore, 169 Wn. App. at 344. In those cases, courts apply plaintiffs' approach, treating the work performed after hour forty as uncompensated and awarding the employee time-and-a-half pay for each overtime hour. In some situations, courts depart from that default and apply the "fluctuating workweek" approach when, among other things, "there is a clear mutual understanding . . . that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period." Inniss v. Tandy Corp., 141 Wn.2d 517, 525 (2000) (quoting 29 C.F.R. § 778.114).

The nature of salary pay limits the "fluctuating workweek" inquiry to salary situations, and the inquiry's concerns do not apply to commissioned employees. Although a commissioned employee's hourly rate (and overtime eligibility) must also be reverse engineered, the starting point is not a fixed weekly compensation assumed to cover a standard forty-hour workweek. Forty hours is not the default measure for commissioned employees. Indeed, a commission-based compensation system is intended to compensate output rather than hours and may

intentionally eschew hours as a measuring stick. The Court need not engage the fluctuating-workweek inquiry here, because that inquiry is limited to cases involving salaried employees.

On the question of how to calculate plaintiffs' regular rate and overtime premium, the Court concludes that Bankers Life's approach is appropriate. Nothing in the record suggests that plaintiffs' compensation was intended to cover forty hours. The Washington Administrative Code ("WAC") provides that "the regular rate of pay may be determined by dividing the amount of compensation received per week by the total number of hours worked during that week." WAC 296-128-550. That approach finds support in the overtime-calculation method for piece-rate workers, who are paid similarly to commissioned employees through a "system [that] generally compensates employees a set amount per unit of work—i.e., apples picked, tax returns completed, miles driven." Hill v. Xerox Bus. Servs., LLC, 868 F.3d 758, 762 (9th Cir. 2017). In its guidance for calculating overtime under the MWA, L&I equates piece-rate and commissioned compensation as "essentially identical" and instructs that a piece-rate employee's regular pay "is obtained by dividing the total weekly earnings by the total number of hours worked in the same week." Wash. Dep't of Labor & Indus., Admin. Policy ES.A.8.2, at 2–3 (Jul. 15, 2014).[7]

For these reasons, the Court concludes that the appropriate approach for calculating plaintiffs' regular rate is to divide total compensation by total hours worked. The overtime premium will then be determined by calculating one-half of the regular rate for each hour worked over forty.

### III. CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment, Dkt. # 95, is DENIED with regard to the issue of liability and with regard to affirmative defenses five,

---

[7] Not only is agency policy persuasive authority in interpreting relevant statutory terms in general, see note 5 supra, but the Washington Court of Appeals specifically relied on L&I's guidance for its overtime analysis in Fiori, 169 Wn. App. at 344–47.

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 11

eleven, twelve, and thirteen; and GRANTED with regard to all other affirmative defenses. Defendant's motion for partial summary judgment, Dkt. # 97, is GRANTED.

DATED this 25th day of June, 2018.

*Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT - 12